Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| FIRSTBANK PUERTO RICO<br><br>**Apelante**<br><br>v.<br><br>PR SIBLINGS, CRL Y OTROS<br><br>**Apelados** | **TA2025AP00635** | ***APELACIÓN***<br>Procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Caso Núm.:<br>**K CD2016-1886**<br><br>Sobre:<br>**Cobro de Dinero** |

Panel integrado por su presidente el juez Sánchez Ramos, la jueza Romero García y el juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de enero de 2026.

Comparece ante nos, FirstBank Puerto Rico, en adelante FirstBank o la parte apelante, y solicita que revisemos la *"Sentencia"* notificada por el Tribunal de Primera Instancia, Sala Superior de San Juan, en adelante TPI-SJ, el 23 de septiembre de 2025. Mediante dicha Sentencia, el Foro Primario resolvió sumariamente y desestimó la demanda presentada por FirstBank, al concluir que no concurrían los elementos de las causas de acción por cobro de lo indebido ni de enriquecimiento injusto. Además, declaró CON LUGAR la *"Reconvención"* en cobro de dinero presentada por los PR Siblings, CRL y otros, en adelante, PR Siblings o la parte apelada, y ordenó el pago de setenta y siete mil diecinueve dólares ($77,019.00), por concepto de canon de arrendamiento desde el 1 de marzo de 2016 hasta el 28 de febrero de 2017, así como los intereses por mora.

Por los fundamentos que expondremos a continuación, *confirmamos* la determinación recurrida.

**I.**

El 26 de septiembre de 2016, FirstBank presentó una demanda en cobro de dinero contra PR Siblings, reclamando la suma de trecientos once mil doscientos sesenta y tres dólares con cincuenta y tres centavos ($311,263.53), alegadamente pagada en exceso en concepto de cánones de arrendamiento correspondientes al período 2005-2015.[1] En lo pertinente, sostuvo que las partes suscribieron el 27 de abril de 1965 un contrato de arrendamiento por un término de cincuenta (50) años sobre una propiedad ubicada en Mayagüez, cuyo canon de arrendamiento sería revisado cada diez (10) años conforme al Índice de Precios al Consumidor (IPC) para Puerto Rico.[2] Alegó que, para el período 2005-2015, el canon fue ajustado erróneamente en ciento nueve por ciento (109%), fijándose en setenta y siete mil diecinueve dólares ($77,019.00) anuales, cuando conforme al IPC aplicable el ajuste correcto debió ser de dieciocho punto cuarenta y cuatro por ciento (18.44%), equivalente a un canon anual de cuarenta y tres mil seiscientos cuarenta y seis dólares con veintiséis centavos ($43,646.26), lo que resultó en un sobrepago ascendente a trecientos treinta y tres mil setecientos veintisiete dólares con cuarenta centavos ($333,727.40). Según la demanda, FirstBank notificó dicha situación mediante comunicación de 9 de marzo de 2015, se reservó el derecho de suspender pagos futuros y, tras la resolución del contrato en abril de 2015, continuó ocupando la propiedad bajo un arrendamiento mes a mes. Luego de suspender el pago de cánones a partir de marzo de 2016 y acreditar las rentas retenidas al monto pagado en exceso, sostuvo que la suma adeudada por los demandados ascendía

---

[1] Entrada 1 de SUMAC, apendice 1.
[2] *Íd.,* págs. 6-34.

a trecientos once mil doscientos sesenta y tres dólares con cincuenta y tres centavos ($311,263.53).[3]

Posteriormente, la demanda fue enmendada en tres (3) ocasiones. Mediante la primera enmienda, presentada el 23 de enero de 2018, se incluyó como partes codemandadas a Nathan Shalom, Mazie Shalom (esposos Shalom) y John Doe.[4] La segunda enmienda, radicada el 26 de febrero de 2018, tuvo como propósito subsanar la omisión de la sociedad legal de gananciales de los esposos Shalom.[5] Posteriormente, mediante una tercera enmienda, presentada el 6 de diciembre de 2018, FirstBank sustituyó a los esposos Shalom, ya fallecidos, por sus sucesores, incluyendo a Joseph Shalom, Abraham Shalom, Max Shalom, Ronny Shalom, Raymon Shalom y Judy Mizrahi, así como herederos desconocidos, en adelante, la Sucesión Shalom o la parte apelada.[6] En esta última enmienda, FirstBank aclaró la titularidad pro indiviso del inmueble, correspondiendo un cincuenta por ciento (50%) a PR Siblings y el restante cincuenta por ciento (50%) a los herederos de los esposos Shalom, y añadió que el canon fijado para el período 2005-2015 fue renegociado utilizando tablas del IPC que posteriormente fueron corregidas retroactivamente por el Instituto de Estadísticas de Puerto Rico, lo que, al recalcular los cánones conforme al IPC corregido, arrojó el alegado pago indebido de trescientos treinta y tres mil setecientos veintisiete dólares con cuarenta centavos ($333,727.40).

Tras acreditar los cánones suspendidos hasta la entrega del inmueble en junio del año 2016, FirstBank reiteró que la suma final adeudada por los demandados ascendía a $311,263.53. Por ello, solicitó al TPI-SJ que ordenara a la parte apelada el reembolso de

---

[3] Entrada 1 de SUMAC, apéndice 1.
[4] *Íd.*, apéndice 4.
[5] *Íd.*, apéndice 5.
[6] *Íd.*, apéndice 6.

las sumas recibidas en exceso, así como el pago de los intereses correspondientes, las costas, los gastos y los honorarios de abogado.[7]

El 16 de abril de 2019, PR Siblings presentó su *Contestación a la Tercera Demanda Enmendada*[8], y el 3 de julio de 2019 la Sucesión Shalom presentó su *Contestación a la Tercera Demanda Enmendada y Reconvención.*[9] En lo pertinente, ambos escritos plantearon alegaciones sustancialmente iguales, mediante las cuales admitieron y negaron en parte las alegaciones de FirstBank.

En síntesis, aceptaron la existencia del Contrato de Arrendamiento otorgado el 27 de abril de 1965, el término pactado, el canon original de $10,000.00 anuales y que FirstBank pagó un canon anual de $77,019.00 para el período 2005-2015, totalizando $770,190.00. No obstante, negaron que dicho canon hubiese sido calculado incorrectamente o que existiera un sobrepago, alegando que el ajuste efectuado en el año 2005 se realizó conforme al IPC entonces vigente ("then current"), según lo dispuesto en la cláusula cuarta del contrato, y que este no permite revisiones retroactivas una vez fijado el canon decenal. Además, sostuvieron que las revisiones metodológicas del IPC no constituyen errores ni tienen efecto retroactivo sobre la historia inflacionaria.[10]

Asimismo, negaron que la suspensión de pagos y las notificaciones cursadas por FirstBank fueran válidas, alegaron que el contrato se renovó por tácita reconducción a partir del 1 de marzo de 2015, y afirmaron que FirstBank incurrió en un patrón de conducta dolosa y engañosa, al continuar ocupando el inmueble y realizar alegadas gestiones de renegociación mientras ya había decidido cerrar la sucursal y notificado dicha determinación a las

---

[7] Entrada 1 de SUMAC, apéndice 6.
[8] *Íd.*, apéndice 7.
[9] *Íd.*, apéndice 8.
[10] *Íd.*, apéndice 8, pág. 4.

autoridades reguladoras, entregando finalmente el inmueble el *29 de junio de 2016.*[11]

A la luz de dichas alegaciones, PR Siblings y la Sucesión Shalom presentaron reconvenciones en las que reclamaron remedios por cobro de dinero e incumplimiento de contrato, así como daños y perjuicios, incluyendo el pago de cánones, intereses, costas, gastos y honorarios de abogado.[12] En lo pertinente, sostuvieron que el recálculo efectuado por FirstBank carecía de base contractual y legal y que FirstBank no ejerció válidamente la opción de renovación, alegando, además, en mala fe contractual y actuaciones fraudulentas y engañosas que les ocasionaron daños económicos.[13]

El 6 de agosto de 2019, FirstBank presentó su *Contestación a la Reconvención Enmendada,* mediante la cual admitió y negó en parte las alegaciones formuladas por PR Siblings y la Sucesión Shalom.[14] En esencia, FirstBank aceptó la vigencia inicial del Contrato de Arrendamiento y que el canon de arrendamiento correspondiente al período 2005-2015 fue fijado en $77,019.00 anuales. Sin embargo, sostuvo que dicho canon resultó incorrecto debido a que el IPC utilizado estaba errado y fue posteriormente corregido de forma retroactiva, lo que, a su juicio, dio lugar al alegado sobrepago. Asimismo, alegó que el contrato no fue renovado, ni por ejercicio válido de opción, ni por tácita reconducción, y que, tras el vencimiento del término contractual, las partes acordaron un arrendamiento de mes a mes, mientras se negociaba la acreditación

---

[11] Entrada 1 de SUMAC, apéndice 8, págs. 4-6.

[12] Según surge del expediente, PR Siblings presentó su reconvención junto con la *Contestación a la Segunda Demanda Enmendada* el 9 de mayo de 2018, la cual indicó permanecía en pleno vigor al contestar la *Tercera Demanda Enmendada* el 16 de abril de 2019, aun cuando omitió reproducir su contenido para evitar duplicidad. Por su parte, la Sucesión Shalom presentó el 3 de julio de 2019 su *Contestación a la Tercera Demanda Enmendada y Reconvención.* Ambos escritos contienen alegaciones sustancialmente idénticas, por lo que se examinan de forma conjunta.

[13] Entrada 1 de SUMAC, apéndice 8, págs. 9-13.

[14] *Íd.*, apéndice 10.

del sobrepago. Por último, FirstBank negó adeudar cánones de arrendamiento o daños en la reconvención, rechazó haber incurrido en conducta fraudulenta o de mala fe y solicitó la desestimación total de dicha reclamación.

Luego de varias incidencias procesales, el 16 de enero de 2024, la parte apelada presentó una *Solicitud de Sentencia Sumaria.*[15] En la misma, expuso la siguiente relación de hechos no controvertidos:

1. El 2 de abril de 1965, Eli Dweck, Esther Dweck, Nathan Shalom y Mazie Shalom suscribieron el Contrato de Arrendamiento con Cosmopolitan Realty Corporation sobre el inmueble que se describe a continuación por un término de cincuenta (50) años:

   URBANA: Solar situado en la Calle del Comercio esquina a Boulevard Santiago Veve, Barrio de la Marina Meridional de esta ciudad de Mayagüez, constando de mil seiscientos cincuenta y seis metros y sesenta y cuatro centímetros cuadrados de superficie, colindante por el Este, con la Calle Comercio; por el Norte con el Boulevard Santiago Veve y con una faja de terreno que constituye la servidumbre de paso del ramal de ferrocarril de la American Railroad Company of Puerto Rico; al Sur, con terrenos de Esmoris y Compañía y al Oeste, con la faja de terreno que constituye la servidumbre de paso del expresado ramal de ferrocarril de la American Railroad Company of Puerto Rico. En este solar enclava un edificio de concreto armado denominado "Stadium" Finca número 7,163, inscrita en el Registro de la Propiedad de Mayagüez.[16]

2. PR Siblings es titular del 50% del inmueble como sucesor en interés de Eli Dweck y Esther Dweck. El restante 50% le pertenece a Nathan Shalom y Mazie Shalom, hoy fallecidos. Sus herederos son Joseph Shalom, Albert Shalom', Max Henry Shalom, Ronald David Shalom, Raymond Marloub Shalom y Judith Freeda Shalom. A su vez, Joseph Shalom ya falleció y sus herederos son Elaine Mazzie Shalom t/c/p Elaine Aizer; Nathan J. Shalom t/c/p Nathan Shalom, Leslie Zakie Shalom t/c/p Leslie Terzie and David Shalom.[17]

3. El término inicial del Contrato de Arrendamiento era de cincuenta (50) años, comenzando el 1 de marzo de 1965 y expirando el 28 de febrero de 2015.[18]

4. El arrendatario tenía el derecho de prorrogar el arrendamiento por dos (2) términos adicionales sucesivos de veinte (20) años y una última opción de nueve (9) años.[19]

5. Los términos y condiciones del Contrato de Arrendamiento no pueden ser enmendados unilateralmente. Sobre este asunto, dicho contrato dispone como sigue:

---

[15] Entrada 1 de SUMAC, apéndice 11.

[16] *Íd.,* pág. 28. FirstBank estipuló que no hay controversia en cuanto a este hecho. (apéndice 12, página 5).

[17] *Íd.*, págs. 48-49.

[18] *Íd.*, pág. 31. FirstBank estipuló que no hay controversia en cuanto a este hecho. (página 6).

[19] *Íd.,* pág. 52. FirstBank estipuló que no hay controversia en cuanto a este hecho. (página 6).

This lease shall be binding upon the parties hereto, their respective heirs, legal representatives, successors in interest, and as signs. This lease constitutes the whole agreement between the parties. **There are no terms, obligations, covenants, or conditions other than contained herein. No modifications or variations thereof shall be deemed valid unless evidenced by an agreement in writing.**[20]

(Énfasis suplido).

6. El canon anual de arrendamiento inicial de $10,000.00 sería revisado y ajustado al final de cada periodo de diez (10) años.[21] El ajuste sería proporcional al cambio neto en el Índice de Precios al Consumidor Para Todas Las Familias (en adelante, "IPC") publicado por el Departamento del Trabajo del Estado Libre Asociado de Puerto Rico (en adelante, "Departamento del Trabajo") que estuviera vigente al momento del ajuste ("then current"). Sobre este asunto, el Contrato de Arrendamiento dispone como sigue:

> Four: Tenant shall pay as rent for the demised premises the following: Ten Thousand Dollars ($10,000.00) annually, for the first ten (10) years and all years thereafter unless such amount is adjusted as herein provided, at the end of each and every ten-year period during the term of this lease or any renewal period thereof. Landlord and Tenant shall adjust the then current amount to be paid as rent so as to arrive at an amount to be paid for the next ten years thereafter, if necessary; such necessity shall be determined by reference to the then current consumer price index for Puerto Rico, published by the Department of Labor of the Commonwealth of Puerto Rico under the heading "All Items", and the adjustment, if any, shall be made in proportion to and in the direction of any net change in the aforesaid index during the preceding ten years (taking as a basis for such change the index level as of January First, Nineteen Hundred Sixty-Five). [...] Rent shall be payable in equal monthly installments, in advance, on or before the tenth day of each and every month, commencing with the first month of the initial term.[22]

(Énfasis suplido).

7. La frase "by reference to the then current consumer price index" contenido en la Cláusula Cuarta del Contrato de Arrendamiento hace referencia al IPC que estaba vigente al momento de hacerse el ajuste.[23]

8. La canasta de bienes y servicios (fórmula matemática) utilizada para determinar el IPC es revisado de tiempo en tiempo.[24]

9. FirstBank asumió el Contrato de Arrendamiento en el 2003.[25]

---

[20] Entrada 1 de SUMAC, apéndice 11, págs. 46-47. FirstBank estipuló que no hay controversia en cuanto a este hecho. (página 6).

[21] *Íd.*, págs. 54-55.

[22] *Íd.*, págs. 32-33. FirstBank estipuló que no hay controversia en cuanto a este hecho. (página 7).

[23] *Íd.*, págs. 55-56.

[24] *Íd.*, pág. 73. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 8).

[25] *Íd.*, apéndice 11, pág. 51. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 8).

10. El canon de arrendamiento para el período de diez años entre el 1 de marzo de 1995 y el 28 de febrero de 2005 era de $36,850.80 anual.[26]

11. Para el mes de marzo de 2005, la fluctuación en la serie del IPC entonces vigente para el período de diez (10) años a partir del 1 de marzo de 1995 fue de 109%. Los datos del IPC usados por FirstBank para determinar el aumento de 109% fueron provistos por un economista. A base de esos datos, FirstBank calculó que el canon anual de arrendamiento que estaría vigente entre el 1 de marzo de 2005 y el 28 de febrero de 2015 sería de $77,019.00 anuales ($36,850.80 + 109%).[27]

12. Los datos del IPC utilizados el 30 de marzo de 2005 por FirstBank cuando calculó fluctuación del IPC durante los diez (10) años previos fueron obtenidos de la única serie del IPC vigente en ese momento.[28]

13. El 30 de marzo de 2005, FirstBank y PR Siblings -en representación de los arrendadores- firmaron el documento que establecía que el canon para el período de diez (10) años que estaría vigente entre el 1 de marzo de 2005 y el 28 de febrero de 2015 sería de $77,019.00 anuales.[29]

14. El cálculo matemático que aparece en la carta del 30 de marzo de 2005 en torno al aumento en el índice de precios al consumidor de 109% y la renta anual de $77,019.00 es anual [sic] es correcto.[30]

15. La serie del IPC que estaba vigente al 30 de marzo de 2005, tenía como año base el 1984.[31]

16. La carta del 30 de marzo de 2005 fue redactada en su totalidad por FirstBank.[32]

17. El canon anual de arrendamiento de $77,019.00 establecido en marzo de 2005 "fue efectuado de acuerdo a los términos y condiciones del contrato existente".[33]

18. FirstBank admitió que el canon de arrendamiento anual de $77,019.00 anuales fue determinado a base de la información que tenía disponible en ese momento.[34]

---

[26] Entrada 1 de SUMAC, págs. 172-174. Además, FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 8).
[27] Entrada 1 de SUMAC, apéndice 11, págs. 58-59. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 8).
[28] *Íd.*, pág. 172. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 9).
[29] *Íd.* FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 9).
[30] *Íd.*, apéndice 11, pág.59.
[31] *Íd.*, págs. 204-206. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 9).
[32] *Íd.* FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 10).
[33] *Íd.* FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 10).
[34] *Íd.*, págs. 62-72. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 10).

19. FirstBank comenzó a pagar el canon anual de $77,019.00 a partir del 1 de marzo de 2005.[35]

20. En noviembre de 2010, el Departamento del Trabajo publicó "el resultado de un cambio metodológico sustancial en la confección del IPC y publicó una nueva serie del índice que revisó sus valores no solo de manera prospectiva, sino también de manera retroactivas previas al año de la revisión metodológica. Esta acción [...] produjo una serie alterna (paralela) del IPC para el período 1995-2004."[36]

21. FirstBank admitió que en noviembre de 2010, el Departamento del Trabajo de Puerto Rico publicó una nueva serie del IPC, pero que continuó pagando el canon anual de arrendamiento acordado el 30 de marzo de 2005.[37]

22. La revisión del IPC consistió en definir una nueva canasta de bienes y servicios consumidos por los hogares puertorriqueños, y también en introducir nuevas fórmulas de cálculo para el índice y sus componentes.[38]

23. Mediante carta con fecha de 9 de marzo de 2015, FirstBank notificó a los arrendadores la existencia de un alegado error en el cómputo del canon de arrendamiento acordado el 30 de marzo de 2005. Al hacer los cómputos, FirstBank aplicó de forma retroactiva al 30 de marzo de 2005, la nueva serie del IPC publicada en noviembre de 2010.[39]

24. El Contrato de Arrendamiento no contiene cláusula alguna que le conceda a las partes el derecho de aplicar retroactivamente una nueva serie del IPC para modificar un ajuste al canon de arrendamiento anual que se realizó a base de la serie del IPC vigente en ese momento ("then current").[40]

25. El 6 de abril de 2015, los arrendadores le solicitaron a FirstBank que desalojara el inmueble por no haber ejercido la opción de extender el término del Contrato de Arrendamiento.[41]

26. El 24 de abril de 2015, FirstBank rechazó la aseveración de los arrendadores de que no había ejercido de forma oportuna la opción para extender el Contrato de Arrendamiento. Sostuvo que había notificado oportunamente su intención de extender la vigencia del Contrato de Arrendamiento por lo que solicitó que se dejara sin efecto la solicitud de desalojo. En lo pertinente, FirstBank expresó que:

> Contrary to your assertion, it is our position that FirstBank provided sufficient notice to exercise its option to renew. [... Our electronic and telephonic communications reveal that

---

[35] Entrada 1 de SUMAC. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 10).

[36] *Íd.*, apéndice 11, págs. 82-83.

[37] *Íd.,* págs. 62-72. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 11)

[38] *Íd.*, apéndice 11, págs. 84-85

[39] *Íd.,* págs. 208-210. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 12)

[40] *Íd.,* págs. 26-47. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 12)

[41] *Íd.,* apéndice 11, pág. 211. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 13)

> FirstBank's acknowledged its intention to extend the term of the Lease.
> [...]
> Hence, both parties involved in the negotiation knew the specific status of such renewal option, which was validly exercised.[42]
> (Énfasis suplido).

27. Para los arrendadores, la admisión de FirstBank de que habían ejercido la opción de extender el Contrato de Arrendamiento significó que se extendió su vigencia por veinte (20) años.[43]

28. La primera extensión del Contrato de Arrendamiento es de veinte (20) años.[44]

29. Los arrendadores dejaron sin efecto la solicitud de desalojo como resultado de la admisión de FirstBank de que había ejercido el derecho a extenderlo por veinte (20) años.[45]

30. FirstBank no puso condición alguna al ejercer la opción de extender el Contrato de Arrendamiento por un plazo de veinte (20) años.[46]

31. Durante su deposición, FirstBank reafirmó la aseveración de que había ejercido oportunamente la opción de extender el Contrato de Arrendamiento por veinte (20) años.[47]

32. El 7 de marzo de 2016, FirstBank le informó a los arrendadores que no pagaría el canon anual de arrendamiento para el año que comenzaba el 1 de marzo de 2016.[48]

33. El 4 de mayo de 2016, FirstBank notificó a los arrendadores su decisión de cerrar la sucursal que ubicaba en el inmueble para el 31 de mayo de 2016 y que abandonaría el inmueble en o antes del 30 de junio de 2016.[49]

34. FirstBank abandonó el inmueble el 30 de junio de 2016.[50]

35. La fluctuación en el IPC entre el 2005 al 2015 es de 28.71% a base del IPC vigente en el 2015. Por tanto, según el Contrato de Arrendamiento el canon anual a partir del 1 de marzo de 2015 es de $99,130.00 anual ($77,019 x 1.2871).[51]

36. FirstBank no pagó el canon de arrendamiento anual a partir del 1 de marzo de 2016 y desde entonces no ha hecho pago alguno.[52]

---

[42] Entrada 1 de SUMAC, apéndice 11, pág. 212-213.

[43] *Íd.,* apéndice 11, pág. 219-220.

[44] *Íd.,* pág. 52.

[45] *Íd.,* págs. 218-219.

[46] *Íd.*, apendice 11, págs. 220-221.

[47] *Íd.*, pág. 223-224.

[48] *Íd.*, pág. 226-227.

[49] *Íd.*, pág. 228-229. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 16)

[50] *Íd.*, pág. 230-231. FirstBank lo estipuló en la Oposición a Solicitud de Sentencia Sumaria. (página 17)

[51] *Íd.,* apéndice 11, pág. 90.

[52] *Íd.*, pág. 70.

37. PR Siblings ha actuado en todo momento como administrador del inmueble, tomando decisiones en representación de los restantes dueños.[53]

La relación de hechos expuesta por FirstBank en su moción para que se dictara sentencia sumariamente fue sustentada con los siguientes documentos:

1. Contrato de Arrendamiento[54]
2. Certificación del Registro de la Propiedad[55]
3. Deposición a FirstBank de 20 de septiembre de 2019 [56]
4. Contestación a la Reconvención de 6 de agosto de 2019[57]
5. Informe pericial de Juan Lara[58]
6. Carta de 30 de marzo de 2005[59]
7. Serie del IPC vigente al 30 de marzo de 2005[60]
8. Publicación del Departamento del Trabajo de marzo de 2005[61]
9. Contestación a Requerimiento de Admisiones[62]
10. Carta de 9 de marzo 2015[63]
11. Carta de 6 de abril de 2015[64]
12. Carta de 24 de abril de 2015[65]
13. Deposición a PR Siblings de 2 de marzo de 2022[66]
14. Deposición a FirstBank de 2 de octubre de 2019[67]
15. Carta de 7 de marzo de 2016[68]
16. Carta de 4 de mayo de 2016[69]

Por estos hechos, la parte apelada solicitó que el Foro Apelado declarara No Ha Lugar a la *Tercera Demanda Enmendada,* Ha Lugar la *Reconvención,* y condenara a FirstBank al pago de todos los cánones de arrendamientos adeudados al momento en que se dicte la sentencia, así como al pago de todos los ingresos dejados de

---

[53] Entrada 1 de SUMAC, apéndice 11, pág. 215.
[54] *Íd.,* págs. 26-47.
[55] *Íd.,* págs. 48-49.
[56] *Íd.,* págs. 50-61.
[57] *Íd.,* págs. 62-72.
[58] *Íd.,* págs. 73-171.
[59] *Íd.,* págs. 172-174.
[60] *Íd.,* págs. 175-193.
[61] *Íd.,* págs. 194-203.
[62] *Íd.,* apéndice 11, págs. 204-207.
[63] *Íd.,* págs. 208-210.
[64] *Íd.,* pág. 211.
[65] *Íd.,* págs. 212-213.
[66] *Íd.,* págs. 214-221.
[67] *Íd.,* págs. 222-225.
[68] *Íd.,* págs. 226-227.
[69] *Íd.,* págs. 228-231.

devengar desde la fecha en que se dicte la sentencia hasta el 28 de febrero de 2035.

Por su parte, el 1 de marzo de 2024, FirstBank presentó su *Oposición a Solicitud de Sentencia Sumaria,* en la cual admitió un total de veintidós (22) de los treinta y siete (37) párrafos de hechos no controvertidos propuestos por la parte apelada y ofreció respuestas específicas para los párrafos 2, 7, 14, 20, 22, 26, 27, 28, 29, 30, 31, 32, 35, 36 y 37. [70] Para sustentar sus alegaciones, presentó los siguientes documentos:

1. Correo electrónico enviado por Eli D. Dweck a Fernando Valverde, fechado 4 de enero de 2016, a las 3:01p.m.[71]
2. Carta de 10 de septiembre de 2010 sobre Índice Oficial de Precios al Consumidor de Puerto Rico (Revisión 2010).[72]
3. Página 53, línea 5 a la 21 de la transcripción de Juan Lara.[73]
4. Página 41-42 de la deposición de Juan Lara.[74]
5. Artículo *Un Agujero en la Historia Económica de Puerto Rico.* [75]
6. Página 84-85 de la Deposición de Juan Lara.[76]

Posteriormente, el 23 de septiembre de 2025, el TPI-SJ notificó su *Sentencia* en la cual declaró *Ha Lugar* la solicitud de la parte apelada para que se adjudicara sumariamente, y desestimó la *Demanda* instada por FirstBank.[77]

El 8 de octubre de 2025, FirstBank presentó *Solicitud en Reconsideración y para que se formulen determinaciones de hechos adicionales,* a la cual PR Siblings se opuso mediante escrito presentado el 17 de octubre de 2025.[78] Evaluadas ambas mociones, el TPI-SJ emitió una *Resolución,* notificada el 5 de noviembre de 2025, declarando *No Ha Lugar* la reconsideración solicitada.[79]

Inconforme con el proceder del Foro Primario, el 5 de diciembre de 2025, FirstBank recurrió ante esta Curia mediante la

---

[70] Entrada 1 de SUMAC, apéndice 12.
[71] *Íd.,* pág. 30.
[72] *Íd.,* págs. 31-35.
[73] *Íd.,* pág. 53.
[74] *Íd.,* págs. 37-38.
[75] *Íd.,* pág. 39.
[76] *Íd.,* págs. 40-41.
[77] Entrada 1 de SUMAC, apéndice 13.
[78] Entrada 8 de SUMAC, apéndice 4.
[79] Entrada 1 de SUMAC, apéndice 16.

presentación de un recurso de *"Apelación"*, en el cual imputó al TPI-SJ los siguientes señalamientos de error:

> **PRIMERO: Cometió grave error y abusó de su discreción Tribunal de Primera Instancia al excluir determinaciones de hechos materiales y sustanciales en su dictamen.**
>
> **SEGUNDO: Cometió grave error y abusó de su discreción el Tribunal de Primera Instancia al aplicar la figura de tácita reconducción, cuando existe evidencia documental de que el arrendador acordó continuar el arrendamiento de mes a mes.**
>
> **TERCERO: Cometió grave error y abusó de su discreción el Tribunal de Primera Instancia al negarse a aplicar la figura de error de hecho al contratar.**[80]

El 11 de diciembre de 2025, PR Siblings presentó una *Solicitud de Desestimación*.[81] En respuesta, el 15 de diciembre de 2025, FirstBank presentó su *Oposición a la Moción de Desestimación y Solicitud de Imposición de Sanciones y de Honorarios de Abogado por la Temeridad Desplegada*.[82] Mediante *Resolución* emitida el 17 de diciembre de 2025, este Tribunal declaró *No Ha Lugar* la Solicitud de Desestimación presentada por PR Siblings.[83]

Finalmente, el 31 de diciembre de 2025, PR Siblings presentó su *Alegato en Oposición al Recurso de Apelación*.

## II.

### A. Apelación Civil

Las Reglas de Procedimiento Civil se desenvuelven en un orden lógico, natural y armonioso entre sí. Este orden queda demostrado en las distintas etapas de un litigio (alegaciones, mociones, descubrimiento de prueba, vistas evidenciarias, sentencia, reconsideración, *apelación*) y sus efectos escalonados. Cada etapa se sirve de la anterior y se proyecta, entonces, para la próxima. *Vega v. Alicea*, 145 DPR 236, 238 (1998).

---

[80] Entrada 1 de SUMAC.
[81] Entrada 4 de SUMAC.
[82] Entrada 6 de SUMAC.
[83] Entrada 7 de SUMAC.

La *apelación* no es un recurso discrecional como en los casos de certiorari. Una vez se cumpla con los requisitos jurisdiccionales y de perfeccionamiento del recurso, el Tribunal de Apelaciones viene obligado a atender el asunto y resolverlo en sus méritos, de forma fundamentada. *Soc. de Gananciales v. García Robles*, 142 DPR 241, 252 (1997). En ese sentido, reconocemos que existe el derecho estatutario para acudir en apelación ante el Tribunal de Apelaciones cuestionando toda sentencia final emitida por el Tribunal de Primera Instancia. *Silva Barreto v. Tejada Martell*, 199 DPR 311, 317 (2017).

Es harto conocido que, al revisar una determinación de un foro de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Como regla general, los foros apelativos no tenemos facultad para sustituir las determinaciones de hechos del tribunal de instancia con nuestras propias apreciaciones. *Íd.*, pág. 771; *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). De manera que, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

Sin embargo, la norma de deferencia esbozada encuentra su excepción y cede cuando la parte promovente demuestra que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad. *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 710 (2012). Además, se requiere que nuestra intervención en esta etapa evite un perjuicio sustancial. *Rivera et al. v. Arcos Dorados et*

*al.,* 212 DPR 194, 207 (2023); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

Por *discreción* se entiende el "tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción". *García v. Asociación,* 165 DPR 311, 321 (2005), citando a *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990). No obstante, "el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad". *Íd.* A esos efectos, el Tribunal Supremo de Puerto Rico ha indicado cuáles son situaciones que constituyen un abuso de discreción, a saber:

> [C]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos. *Ramírez v. Policía de P.R.*, 158 DPR 320, 340-341 (2002), citando a *Pueblo v. Ortega Santiago*, supra, págs. 211-212. Así, pues, la discreción no implica que los tribunales puedan actuar de una forma u otra en abstracción del resto del derecho. *Rivera et al. v. Arcos Dorados et al.*, supra.

### B. Sentencia Sumaria

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Negrón Castro y otros v. Soler Bernardini y otros,* 2025 TSPR 96, 216 DPR ___ (2025); *Coop. Seguros Múltiples y otros v. ELA y otros,* 2025 TSPR 78, 216 DPR ___ (2025); *Consejo Tit. v. Rocca Div. Corp. et als,* 2025 TPSR 6, 215 DPR ___ (2025); *BPPR v. Cable Media,* 2025 TSPR 1, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2023); *Birriel Colón v. Econo y otro,* 213

DPR 80, 90 (2023); *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *Oriental Bank v. Caballero García*, 212 DPR 671, 678 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601, 610 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *BPPR v. Zorrilla Posada y otro,* 214 DPR 329, 337 (2024); *Cruz, López v. Casa Bella y otros,* supra, pág. 993; *Oriental Bank v. Caballero García,* supra, pág. 678; *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 980. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. Reglas 36.1 y 36.2 de Procedimiento Civil, supra.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 979; *Ramos Pérez v. Univisión,* 178 DPR 200, 214 (2010). Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Id.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la

cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. Regla 36.3 de Procedimiento Civil, supra; *Oriental Bank v. Caballero García,* supra, pág. 679; *Pérez Vargas v. Office Depot,* 203 DPR 687, 698 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *BPPR v. Cable Media,* supra; *BPPR v. Zorrilla Posada y otro,* supra; *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Id.* Es decir, el hecho de no oponer a un petitorio sumario no implica que este necesariamente proceda, sin embargo, si no se demuestra que existen controversias sustanciales sobre los hechos materiales, nada impide al foro sentenciador de dictar sentencia sumaria. *Ramos Pérez v. Univisión,* supra, pág. 215.

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos

que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra, pág. 44. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil, supra. *Id.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Id.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil, supra, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole,* 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *E.L.A. v. Cole,* supra, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá, cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Soto y otros v. Sky Caterers,* supra; *Cruz, López v. Casa Bella y otros,* supra,

pág. 993; *Acevedo y otros v. Depto. Hacienda y otros,* 212 DPR 335, 350 (2023); *Segarra Rivera v. Int'l. Shipping et al.,* supra. Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Id.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otros v. ELA y otros,* 211 DPR 455, 471-472 (2023).

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el Foro Primario. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas,* supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, "nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de

una sentencia sumaria". *Negrón Castro y otros v. Soler Bernardini y otros,* supra; *Batista Valentín v. Sucn. Batista Valentín y otros,* 2025 TSPR 93, 216 DPR ___(2025). *Coop. Seguros Múltiples y otros v. ELA y otros,* supra; *Consejo Tit. v. Rocca Div. Corp. et als,* supra; *Soto y otros v. Sky Caterers,* supra; *BPPR v. Cable Media, BPPR v. Zorrilla Posada y otro,* supra; *Cruz, López v. Casa Bella y otros,* supra, pág. 994. Por ello, nuestra revisión es una *de novo,* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, supra, y su jurisprudencia interpretativa. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar de *novo* si el foro primario aplicó correctamente el derecho.

### C. Tácita Reconducción

En nuestra jurisdicción opera el principio de libertad de contratación. El Art. 1207 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3372, establece que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." *Batista Valentín v. Sucn. Batista Valentín y otros*, supra; *Cruz López v. Casa Bella y otros*, supra., pág. 995. Una vez perfeccionado el contrato, éste tiene fuerza de ley entre las partes. Art. 1044 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2995.[84]

Cuando las partes otorgan un contrato y sus términos son claros, estos deben interpretarse conforme a su sentido literal. A esos efectos, el Art. 1233 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3471, dispone que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes,

---

[84] El 28 de noviembre de 2020, entró en vigor el nuevo Código Civil de Puerto Rico, Ley Núm. 55-2020. No obstante, los hechos del caso de epígrafe ocurrieron previo a la fecha de vigencia del citado estatuto, por lo que haremos referencia y esbozaremos el derecho a la luz del derogado Código.

se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquellas."

En el *arrendamiento de cosas,* una de las partes se obliga a conceder a la otra el goce o uso de una cosa por tiempo determinado y precio cierto. Art. 1433 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 4012. Cuando el arrendamiento se ha hecho por tiempo determinado, el mismo concluye el día prefijado sin necesidad de requerimiento. Art. 1455 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 4062. No obstante, el propio ordenamiento civil reconoce una excepción a esta regla general mediante la figura de la *tácita reconducción.*

El Art. 1457 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 4064, establece que "[s]i al terminar el contrato permanece el arrendatario disfrutando quince (15) días de la cosa arrendada con aquiescencia del arrendador, se entiende que hay tácita reconducción por el tiempo que establecen los Artículos 1467 y 1471, a menos que haya precedido requerimiento." Conforme a esta disposición, puede ocurrir que, habiendo expirado el término del contrato, el arrendatario continúe en posesión del inmueble sin oposición del arrendador, lo que da lugar a la renovación del arrendamiento por consentimiento implícito.

La jurisprudencia ha identificado los requisitos necesarios para que opere la tácita reconducción. En *Dalmau v. Hernández Saldaña,* 103 DPR 487, 490 (1975), se estableció que deben concurrir los siguientes elementos: **"(1) que al terminar el contrato de arrendamiento permanezca el arrendatario disfrutando por quince (15) días de la cosa arrendada, (2) que lo haga con aquiescencia del arrendador, y (3) que no haya precedido requerimiento, es decir, una expresión realizada por cualquiera de las partes a la otra de su voluntad de dar por terminado el**

**arrendamiento."** (Énfasis suplido). En consecuencia, es indispensable que se cumpla con todos estos requisitos para que pueda darse la tácita reconducción.

En cuanto al requerimiento, se ha señalado que este constituye una manifestación inequívoca de la voluntad del arrendador de no prestar su consentimiento a la continuación del contrato de arrendamiento. Así, para evitar que opere la tácita reconducción, el arrendador debe manifestar su oposición antes de que transcurra el término de quince (15) días. *Cesaní Vargas v. Tribunal Superior,* 92 DPR 239, 243 (1965).

Ahora bien, la *tácita reconducción* no constituye una prórroga del contrato original, sino un nuevo contrato de arrendamiento. Así lo expresó el Tribunal Supremo en *Cesaní Vargas v. Tribunal Superior*, supra., al indicar que la tácita reconducción no constituye una extensión del contrato original, toda vez que, conforme al mandato expreso de la ley, el arrendamiento se extingue automáticamente al vencimiento de su término, sin que sea necesario requerimiento alguno. Por ende, una vez cumplido el término pactado, queda extinguido el contrato original y surge una nueva relación contractual.

Como consecuencia de ello, se presume que el nuevo contrato queda sujeto a iguales condiciones y a igual canon que el anterior. *Dalmau v. Hernández Saldaña*, supra, pág. 490. No obstante, dicha presunción admite excepciones. En particular, el tiempo de duración del nuevo arrendamiento no es el estipulado en el contrato original, sino el que señalan los Artículos 1467 y 1471 del Código Civil de Puerto Rico de 1930, según se trate de predios rústicos o fincas urbanas.

**D. Cobro de lo indebido**

Con orígenes en el remoto derecho romano, la concepción del cobro o pago de lo indebido fue incorporado en el Código Civil Español, que a su vez ilustró el nuestro. *Sepúlveda v. Depto. de Salud*, 145 DPR 560, 566 (1998). El Artículo 1785 del ahora derogado Código Civil de 1930, 31 LPRA ant. sec. 5121, establecía que se configura el cobro de lo indebido "[c]uando se recibe una cosa que no había derecho a cobrar, y que por error ha sido indebidamente entregada, surge la obligación de restituirla".

Mientras, el derogado Art. 1796 del mismo Código, *supra,* ant. sec. 5122, establecía que "[e]l que acepta un pago indebido, si hubiera procedido de mala fe, deberá abonar el interés legal cuando se trate de capitales, o los frutos percibidos o debido percibir cuando la cosa recibida los produjera [...]".

Ahora bien, en el caso *E.L.A. v. Crespo Torres*, 180 DPR 776 (2011), nuestro más Alto Foro discutió el desarrollo de la doctrina del cobro de lo indebido. Desde el año 1914, se había hecho la distinción del error de hecho y el error de derecho en cuanto al cobro de lo indebido. Así, citando a *Sepúlveda v. Depto. de Salud*, supra, pág. 568, define como un error de Derecho como:

> [A]quel en el que incurre quien actúa sin ajustarse a lo dispuesto por una norma jurídica vigente. En el contexto del cobro de lo indebido comete error de derecho quien realiza un pago bajo la creencia de que el mismo le es exigible en Derecho, bien por desconocimiento de la norma que lo descarga del pago, bien por una interpretación errónea del Derecho aplicable.

Adviértase que, antes del caso *E.L.A. v. Crespo Torres,* supra, la doctrina del cobro de lo indebido se limitaba a instancias de pago que surgieran de un error de hecho, mas no así de un error de derecho. *Pagán Santiago v. A.S.R.*, 185 DPR 341, 368 (2012). Por lo tanto, cuando tales reclamaciones estaban predicadas en un error

de derecho, estas no procedían. *Pagán Santiago v. A.S.R.*, supra; *Aulet v. Depto. Servicios Sociales*, 129 DPR 1, 48 (1991) citando a A.C.A.A. v. Bird Piñero, 115 DPR 463, 467 (1984).

Ahora bien, en *E.L.A. v. Crespo Torres*, supra, pág. 799, nuestro Tribunal Supremo concluyó, por primera vez, que "cuando se recibe alguna cosa que no había derecho a cobrar y que por error ha sido entregada, sea por error de hecho o derecho, surge el deber de restituirlo". Al así resolver, nuestro más Alto Foro creó una nueva causa de acción - a saber, una acción por cobro de lo indebido basada en un error de derecho – que se aplicaría "de manera prospectiva". *E.L.A. v. Crespo Torres*, supra, págs. 797, 799.

Ahora bien, al analizar si se configura el cobro de lo indebido, nuestra Alta Curia nos ha señalado una serie de requisitos, a saber: 1) **el pago debe hacerse con la intención de extinguir una deuda;** 2) **que no exista obligación jurídica entre el que paga y cobra y** 3) **que el mismo se haya hecho por error y no por mera liberalidad u otro concepto.** *E.L.A. v. Crespo*, supra, págs. 793-794. (Enfasis nuestro).

### III.

En su *primer señalamiento de error*, FirstBank sostiene que el TPI-SJ erró y abusó de su discreción al excluir determinaciones de hechos materiales y sustanciales al adjudicar el caso de forma sumaria. *No le asiste la razón.*

Como cuestión inicial, recordamos que la revisión de una sentencia dictada sumariamente es de novo, colocándonos en la misma posición que el Foro Primario para evaluar la procedencia del dictamen conforme a la Regla 36 de Procedimiento Civil, *supra.,* y su jurisprudencia interpretativa. Al revisar una sentencia sumaria, corresponde a este Foro evaluar si el Tribunal Primario identificó correctamente los hechos materiales incontrovertidos y si, a partir de ellos, aplicó adecuadamente el derecho. En ese ejercicio, no toda

discrepancia de las partes constituye una controversia de hechos materiales que impida la adjudicación sumaria. Por el contrario, solo aquellas diferencias que tengan el potencial de alterar el resultado del pleito justifican la celebración de un juicio plenario.

Del examen del expediente se desprende que el Foro de Instancia consideró los hechos esenciales debidamente sustentados con prueba documental admisible, y descartó aquellos planteamientos que, aunque formulados como hechos, en realidad constituían argumentos legales, inferencias jurídicas o apreciaciones subjetivas. En particular, los señalamientos de FirstBank relacionados con la corrección retroactiva del IPC, la intención subjetiva de las partes al renegociar el canon en el año 2005 y la razonabilidad del recálculo efectuado en el año 2015, no generaban controversias fácticas reales, sino controversias de derecho que podían resolverse mediante la interpretación del contrato y la normativa aplicable.

Asimismo, el récord no refleja que el TPI-SJ haya ignorado hechos materiales importantes ni que haya concedido peso indebido a hechos inmateriales. Por el contrario, el tribunal identificó los hechos incontrovertidos pertinentes, incluyendo: el texto del contrato de arrendamiento, el mecanismo pactado para el ajuste del canon, las comunicaciones cursadas entre las partes y las propias admisiones de FirstBank, y concluyó que no existía controversia sustancial que requiriera un juicio o la celebración de una vista evidenciaria.

El hecho de que FirstBank discrepe de la apreciación jurídica del Foro Primario o de la conclusión alcanzada no convierte dicha discrepancia en una controversia de hechos materiales. En ausencia de prueba concreta que controvierta los hechos esenciales aceptados por el Tribunal, el Foro Sentenciador estaba facultado para disponer del pleito por la vía sumaria.

En consecuencia, FirstBank no logró demostrar que el TPI-SJ incurriera en abuso de discreción, error manifiesto o prejuicio al excluir las alegadas determinaciones fácticas. La actuación del Foro Primario estuvo razonablemente fundamentada y conforme a derecho.

En atención a la relación existente entre el *segundo y tercer error*, procederemos a analizarlos en conjunto. En sus señalamientos segundo y tercero, FirstBank alega que el Foro Primario erró y abusó de su discreción al aplicar la figura de la tácita reconducción, pese a existir, según sostiene, evidencia documental de que las partes acordaron continuar el arrendamiento de mes a mes, y al negarse a aplicar la doctrina de error de hecho al contratar. *Ambos planteamientos carecen de mérito.*

Como punto de partida, corresponde destacar que la determinación sobre si operó o no la tácita reconducción, así como la procedencia de la figura del error al contratar, constituyen cuestiones eminentemente jurídicas, que descansan en la interpretación del contrato de arrendamiento y de los actos efectuados por las partes tras el vencimiento del término pactado. Por ende, dichas controversias eran susceptibles de adjudicación por la vía sumaria, siempre que los hechos esenciales estuvieran incontrovertidos, como ocurrió en este caso.

Conforme surge del expediente, el contrato de arrendamiento suscrito en el año mil novecientos sesenta y cinco (1965) vencía, por sus propios términos, en el año dos mil quince (2015). No obstante, luego de transcurrido dicho término, FirstBank permaneció en posesión y disfrute del inmueble por un periodo que excedió ampliamente los quince (15) días establecidos por la ley, con la aquiescencia de los arrendadores y sin que mediara requerimiento oportuno por parte del arrendador para la entrega del bien. Por el contrario, la evidencia documental revela que las partes continuaron

interactuando respecto a la ocupación del inmueble, el pago de obligaciones accesorias y la relación contractual existente.

Particularmente reveladoras resultan las comunicaciones intercambiadas entre las partes con posterioridad al vencimiento contractual, en las cuales FirstBank reconoce expresamente la continuación del arrendamiento mientras se dilucidaban controversias pendientes relacionadas con el recálculo del canon de arrendamiento conforme al IPC, el alegado sobrepago y la acreditación de dichas sumas. Dichas comunicaciones no contienen manifestación alguna de oposición por parte del arrendador ni un requerimiento expreso, inequívoco y terminante dirigido a poner fin a la ocupación del inmueble dentro del término legal pertinente. Esta conducta resulta incompatible con la manifestación clara y oportuna de oposición que exige el ordenamiento para impedir la tácita reconducción.

Si bien FirstBank caracterizó unilateralmente la relación subsiguiente como un arrendamiento "mes a mes", tal denominación, por sí sola, no constituye un pacto expreso ni bilateral que excluya la aplicación de la figura de la tácita reconducción. Máxime cuando del récord no surge evidencia de un pacto escrito que modificara válidamente los términos del contrato original ni que excluyera expresamente la aplicación de dicha figura. Las comunicaciones intercambiadas entre las partes, lejos de evidenciar un acuerdo definitivo, reflejan un proceso de negociaciones en curso que no tuvo el efecto de producir un nuevo contrato. En ese contexto, el Foro Primario actuó correctamente al concluir que tales gestiones no impedían la aplicación de la tácita reconducción.

De igual modo, *no le asiste la razón* a FirstBank en cuanto a la alegada procedencia de la figura del cobro de lo indebido, ni bajo la óptica de un supuesto error de hecho al contratar. Conforme a los

fundamentos de derecho expresados con aterioridad, para que se configure dicha figura deben concurrir los siguientes elementos: (1) que el pago se haya realizado con la intención de extinguir una deuda; (2) que no exista obligación jurídica entre quien paga y quien cobra; y (3) que el pago se haya efectuado por error y no por mera liberalidad u otro concepto.[85]

En el caso de autos, del expediente no surge evidencia que demuestre la ausencia de una obligación jurídica entre las partes al momento en que se efectuaron los pagos reclamados. Por el contrario, la permanencia de FirstBank en el inmueble con aquiescencia del arrendador, así como la continuación de la relación contractual bajo los mismos términos, evidencian la existencia de una obligación válida que servía de causa para los pagos realizados. Asimismo, no se acreditó que dichos pagos se efectuaran con el propósito de extinguir una deuda inexistente ni que mediara un error jurídicamente relevante que los tornara indebidos.

Los hechos incontrovertidos demostraron que el ajuste del canon efectuado en el año 2005 se realizó utilizando la información oficial disponible en ese momento y conforme al mecanismo expresamente pactado en el contrato. La posterior revisión metodológica del IPC no convirtió retroactivamente dicho ajuste en un error de hecho que viciara el consentimiento ni creó una obligación jurídica de restituir las sumas pagadas.

La alegación de error de hecho planteada por FirstBank se fundamenta, en una discrepancia sobre los efectos económicos del contrato y no en un desconocimiento sustancial de los elementos esenciales del negocio jurídico al momento de su perfeccionamiento. Tal planteamiento no activa la figura del error de hecho ni sustenta,

---

[85] *E.L.A. v. Crespo Torres*, supra., 793-794.

en estas circunstancias, una causa de acción por cobro de lo indebido.

A la luz de lo anterior, *concluimos* que ni la aplicación de la tácita reconducción ni el rechazo de la teoría de error de hecho al contratar constituyeron un abuso de discreción por parte del TPI-SJ. Por el contrario, las determinaciones impugnadas encuentran apoyo razonable en la prueba documental del expediente y constituyen una aplicación correcta del derecho a los hechos del caso. Los señalamientos de error planteados por FirstBank carecen de mérito.

**IV.**

Por lo antes expuesto, *confirmamos la "Sentencia"* apelada, emitida y dictada el 23 de septiembre de 2025, por el TPI-SJ.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones